IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| STEPHEN F. LOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 12-00755-N |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Stephen F. Lott ("Lott") filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that he was not entitled to

disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42

U.S.C. §§ 401-433, or to Supplemental Security Income benefits (SSI) under Title XVI of the

Act, 42 U.S.C. §§ 1381-1383c. Pursuant to the consent of the parties (doc. 14), this action has

been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry

of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. *See* Doc. 16. The

parties' joint motion to waive oral arguments (doc. 15) was granted on June 6, 2013 (doc. 17).

Upon consideration of the administrative record (doc. 10), and the parties' respective briefs

(docs. 11 and 12), the undersigned finds that the decision of the Commissioner is due to be

**AFFIRMED.**

    I. Procedural History.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is to be substituted for Michael J. Astrue as the defendant in this suit. *See*, 42 U.S.C. § 405(g).

Lott filed a Title II application for disability insurance benefits (DIB) and a Title XVI application for Supplemental Security Income benefits (SSI) on May 30, 2008, (Tr. 17, 251-54, 255-57), claiming an onset of disability as of December 15, 2007. (Tr. 17, 251,255). After Lott's claims were initially denied on November 18, 2008 (Tr. 110-11), he requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on February 24, 2010 (Tr. 85-109). An unfavorable decision was issued on March 12, 2010 (Tr. 115-24), in which the ALJ found that Lott was disabled but, because "his substance use disorder is a contributing factor material to the determination of disability[,]. . .[he] has not been disabled within the meaning of the Social Security Act[2] at any time from the alleged onset date through the date of this decision" (Tr. 124). The Appeals Council remanded the matter back to the ALJ on August 26, 2011 (Tr. 130-33), and a new hearing was held on October 3, 2011 (Tr. 58-84).[3] The ALJ issued a new decision on November 14, 2011, in which she again found that Lott was disabled, but because his drug and alcohol abuse was a contributing factor, he was not disabled within the meaning of the Social Security Act (Tr. 17-30).[4] The Appeals Council denied Lott's timely request for review of the ALJ's 2011 decision on November 21, 2012 (Tr. 1-4), thereby making the ALJ's

---

[2] This decision was predicated on the Social Security Act's prohibition of disability benefits if alcoholism or drug addiction is a contributing factor material to the determination of disability. 42 U.S.C. §§ 416(d)(2)(C), 423(d)(2)(C).

[3] The Appeals Council found that the ALJ's decision failed to properly account for Lott's moderate social limitations in the Residual Functional Capacity ("RFC") evaluation (Tr. 17, 131-132). The Appeals Council directed the ALJ to re-evaluate Lott's maximum RFC, obtain supplemental evidence from a vocational expert, and offer Lott the opportunity for another hearing. (*Id.*).

[4] The ALJ's November 14, 2011 decision ("ALJ's decision") is the final decision of the Commissioner on Lott's claims. There are two identical copies of that decision in the administrative record (Tr. 17-30; 39-52). For simplicity's sake, citations in this decision will only be to the copy found at page 17 through 30 of the Transcript.

2011 decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009).[5] Lott

has exhausted all his administrative remedies and now appeals from that final decision.

II. <u>Issues on Appeal</u>.

A. Whether the ALJ erred by not assigning any weight to a Veterans' Administration ("VA") decision issued on December 28, 2009, finding that Lott was "unable to follow a substantial gainful occupation due to disability" effective May 26, 2009 (Tr. 309-16), and failing to explain why she gave the VA decision no weight?[6]

B. Whether the ALJ's residual functional capacity ("RFC") determination was supported by substantial evidence?

III. <u>Standard of Review</u>.

A. <u>Scope of Judicial Review</u>.

In reviewing claims brought under the Social Security Act, this Court's role is a limited

one. Specifically, the Court's review is limited to determining: 1) whether the decision is

supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*,

42 U.S.C. § 405(g); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999); <u>Martin v. Sullivan</u>,

894 F.2d 1520, 1529 (11th Cir. 1990). Thus, a court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the Commissioner. <u>Miles v. Chater</u>, 84 F.3d 1397,

1400 (11th Cir. 1996); <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the

Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.

<u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>Chater</u>, 84 F.3d at 1400; <u>Brown v.</u>

<u>Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991). *See also*, <u>Martin v. Sullivan</u>, 894 F.2d 1520,

1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual

---

[5] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition of part 404, which addresses claims under Title II of the Act. All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

[6] Lott refers to the VA decision as being issued on December 28, 2009. (Doc. 11 at 2). The VA's actual "Rating Decision" is dated December 1, 2009 (Tr. 314-316), and was merely transmitted to Lott under a cover letter issued on December 28, 2009 (Tr. 309-313).

findings, we must affirm if the decision reached is supported by substantial evidence.");

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

B.    Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the

meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[7]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[7] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. Pt. 404 Subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). *Id*. at 1239–40.

C.      Drug and Alcohol Addiction.

In addition to the foregoing five-step evaluation process, the Contract with America Advancement Act of 1996 ("CAAA"), codified at 42 U.S.C. § 423(d)(2)(C), "amended the Social Security Act to preclude the award of benefits when alcoholism or drug addiction is determined to be a contributing factor material to the determination that a claimant is disabled." Doughty v. Apfel, 245 F.3d 1274, 1275 (11th Cir. 2001). Consequently, in those cases in which the Commissioner "determines a claimant to be disabled and finds medical evidence of drug

addiction or alcoholism, the Commissioner then 'must determine whether ... drug addiction or alcoholism is a contributing factor material to the determination of disability.' " *Id.* at 1279, *quoting* 20 C.F.R. § 404.1535. The Eleventh Circuit emphasized that the "key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability ... is **whether the claimant would still be found disabled if he stopped using drugs or alcohol**." *Id.*, *citing* 20 C.F.R. § 404.1535(b)(1)(emphasis added). The Eleventh Circuit also agreed in <u>Doughty</u> with the Fifth Circuit's decision in <u>Brown v. Apfel</u>, 192 F.3d 492 (5th Cir. 1999), and held that "the claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination." *Id.* at 1280 (other citation omitted); *see also id.* at 1276 ("We hold, as a matter of first impression in this Circuit, that the claimant bears that burden.").

The District Courts throughout Alabama have applied <u>Doughty</u> in this manner, including <u>Taylor v. Colvin</u>, 2013 WL 6410401, *13 (S.D. Ala., December 09, 2013)("[C]ontrary to plaintiff's contention, substantial evidence supports the ALJ's conclusion that substance abuse is a contributing factor material to plaintiff's disability and plaintiff, as a consequence, has not carried his burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination."). *See also* <u>Rogers v. Colvin</u>, 2013 WL 4851611, *2 (M.D. Ala., September 10, 2013)("[W]here the record includes medical evidence of a claimant's alcoholism or drug addiction, the claimant must prove that he is "disabled independent of [his] drug addiction or alcoholism" to prevail on his claims; here he did not do so.), *quoting* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii); <u>Whitman v. Colvin</u>, 2013 WL 4045471, *4 (N.D. Ala., August 07, 2013)("Not only was there substantial evidence to support the ALJ's determination that Plaintiff's drug and alcohol use contributed to his disability, but there was also substantial

evidence supporting his finding that the plaintiff would not be disabled apart from his drug and alcohol use [and] [t]he plaintiff, not the Commissioner, bears the burden of proving that he would still be disabled if he stopped using drugs and/or alcohol."); *see also* <u>Simons v. Colvin</u>, 2013 WL 4699500, *7 (M.D. Fla., August 30, 2013)(same); <u>Hill v. Astrue</u>, 2011 WL 4530949, *19 (N.D. Fla., August 24, 2011)(same): <u>Sellers v. Astrue</u>, 2012 WL 2357735, *4 (S.D. Ga., June 20, 2012)(same).

IV.     <u>Relevant Facts</u>.

A.     <u>Lott's vocational background</u>.

Lott was born on December 11, 1952. (Tr. 62).  He was 58 years old on October 3, 2011, the time of his second hearing before the ALJ. (Tr. 62). He graduated from high school as well as college, from which he obtained a Bachelor of Science degree. (Tr. 63). He was in the military from 1972 until August 20, 1974, at which time he was a Specialist Fourth Class.  (Tr. 63). From 1980 to December 2007, Lott was the owner/Operator of Lott's Nursery (Tr. 306) and grew azaleas, which he sold to Walmart and Home Depot (Tr. 64).[8]  He ultimately filed a Chapter 11 Bankruptcy petition and is now out of business. (Tr. 64).  He stopped working on December 15, 2007, because "I went bankrupt and had to stop working" (Tr. 274).

B.     <u>Medical Evidence</u>.

Lott has a long history of cocaine and alcohol abuse and does not dispute or challenge the evidence of record which supports this abuse:

> [Lott] started drinking alcohol when he was 14 (Tr. 546), and the medical records indicate his drinking was an ongoing problem (Tr. 424, 440, 443, 449, 463, 494-95, 499, 521, 528, 536, 545-50, 558, 561-63; *see also* Tr. 65 (testifying at second hearing that he drank about a six pack per week), 92 (testifying at first hearing that he drinks "too much at times")). He began abusing cocaine at age 37 (Tr. 546), and his medical records repeatedly mention ongoing use (Tr. 414, 420-21,

---

[8] Lott testified that, prior to his bankruptcy, he "had 500 Walmarts and 300 Home Depot stores that [he] put flowers in" (Tr. 104).

424-26, 428-29, 437, 440,443, 449, 463, 494-95, 499, 510, 521, 528, 536, 545-50, 558, 561-63, 565-66, 704, 739, 754,769, 779, 783, 790; *see also* 93 (testifying at first hearing that he is still using cocaine and returning to rehab); but see Tr. 66 (testifying at second hearing that he had not used cocaine for about a year). Although he participated in various inpatient and outpatient treatment programs and had brief periods of sobriety (Tr. 447-48, 463, 495, 500, 542-43, 572-699), upon completion, [Lott] returned to drug and alcohol abuse (Tr. 453, 495, 739, 779, 790).

(*See*, Doc. 12 at 3).[9]

Lott was involved in an all-terrain vehicle accident on July 13, 2003, that resulted in a closed head injury (Tr. 333-54). He was discharged from Mobile Infirmary Hospital to Rotary Health (also referred to at Tr. 362 as "Rotary Rehabilitation Hospital") on July 22, 2003, with the following discharge summary, in pertinent part:

Patient's condition continued to progress in the ICU. Patient was weaned off the vent and then transferred to the floor in a stable condition. While on the floor patient has undergone physical therapy and a dietary consultation. Patient is tolerating physical therapy with moderate assistance x 2 and verbal queuing for safety. Due to patient's closed head injury, patient has abnormal gait. . . . Patient is currently hemodynamically stable . . . and preparing to be transferred to Rotary Health.

(Tr. 333). The record contains the following information concerning Lott's rehabilitation:

[Lott] had quite a complicated rehabilitation course secondary to his agitation. General medications were tried with eventual choice of Geodon 60 mg [every] 8 hours; Depakote 1,000 mg [by mouth twice a day]; trazodone 450 mg [by mouth every night at bedtime] and Provigil 200 mg [by mouth every morning]. The patient did well on this medication, however, still required frequent calls to security for agitation and occasional combativeness. The patient required occasional [intramuscular injections] of Ativan and Haldol and occasional [] extra doses [by mouth] of Geodon 60 mg. After a pass on 08/30/03[,] the patient had a very sharp increase in his functional status with GOAT scores greater than 80 times three days demonstrating a clearance of his post traumatic amnesia. The Geodon was rapidly discontinued with improvement in gait disability, maintenance of orientation, and maintenance of mood stability without additional [as needed] medication. The patient demonstrated understanding of his condition

---

[9] Despite his long, admitted history of drug and alcohol abuse, on a 2008 "Drug and Alcohol Use Questionnaire" that he completed in conjunction with his claims for DIB and SSI, Plaintiff claimed to have never had a problem with drugs or alcohol (Tr. 291).

9

and acceptance of his treatment plan.  This represents an excellent outcome considering the severity of his post-traumatic amnesia.

(Tr. 362-63, 365).  Lott was discharged from Rotary Rehabilitation on September 4, 2003, with instructions to receive home health speech therapy three times a week for six weeks, to return to Dr. James M. Crumb in two weeks for continued medication taper, and to return to Dr. Melissa Ogden in three months for neuropsychological evaluation (Tr. 365).

Medical records covering a period from December 18, 2003 to July 12, 2005, relate to Lott's visit to Dr. Mosteller of Premier Medical for treatment of his eyes, including calcium deposits in his blind left eye (Tr. 373-78).  Dr. Mosteller does not indicate in his notes that there is any relationship between Lott's accident in July of 2003 and the treatment provided during this period of December 2003 to July 2005.

On January 8, 2007, after being "discharged from Searcy [Hospital]," Lott presented to AltaPointe Health Systems for substance abuse treatment[10] (Tr. 438).  The assessments completed by William Billett, M.D. and various therapists while Lott was attending AltaPointe programs from January 8, 2007 to June 7, 2007, consistently indicate that his memory was unimpaired, his thoughts were logical, coherent and within normal limits, and no impairments in concentration were noted (Tr. 440, 454; *see also* Tr. 413, 418, 419, 423, 431, 435, 436).

On August 29, 2008, Lott was evaluated by Daniel L. Koch, Ph.D., of Mobile Psychological Associates (Tr. 449-452).  Lott does not challenge the ALJ's finding that this evaluation, which included psychological testing, was not conducted during a period of sobriety

---

[10] Searcy Hospital is a historic site in Mount Vernon, Alabama, which was established in the year 1900 by the Alabama Legislature as a mental health facility.  www.cityprofile.com/alabama/searcy-hospital.html.  AltaPointe Health Systems, Inc., formerly Mobile Mental Health, provides promotes the wellness and recovery of people living with mental illness, substance abuse and intellectual disabilities. www.altapointe.org.  During a subsequent evaluation on November 3, 2008, Lott reported that he had been hospitalized in 2005 after a suicide attempt (Tr. 463).

(Tr. 23).  Dr. Koch diagnosed Lott with Attention Deficit/Hyperactivity Disorder, Depressive

Disorder, Polysubstance Dependence, Antisocial Personality Disorder with Schizoid Personality

Traits, and blindness in the left eye (Tr. 452).  Dr. Koch noted that Lott had an average IQ, a

sixth grade level spelling ability, and a high school level reading and arithmetic abilities (Tr.

451).  He also opined that Lott's attention deficit disorder could benefit from medication to treat

the symptoms (Tr. 451).

     Lott underwent further consultative examination by John W. Davis, Ph.D., on November

3, 2008 (Tr. 462-466).   This examination also did not occur during a period of sobriety for Lott

(Tr. 24).  Although Lott reported "memory problems and difficulty functioning" (Tr. 463), Dr.

Davis found, with respect to concentration and attention:

> [Lott] was able to handle Serial 7's without difficulty.  He can make simple
> change and do simple arithmetic.  He can count backwards from 20 to 1 without
> difficulty. He can spell the word "world" backwards.  There are no indications of
> deficits in his overall concentration or attention.

(Tr. 464).  Dr. Davis also found the following with respect to Lott's immediate, recent and

remote memory and fund of information:

> Immediate: He can handle six digits forward and five digits backwards.  He can
> recall zero of three objects in one minute and zero of three objects in five minutes.
>
> Recent:  He can describe his activities of yesterday without difficulty.  He is able
> to describe the details of the trip to this office without difficulty.  He reports
> memory problems.
>
> Remote:  He remembers the date of Christmas, the age that he was when he left
> school, and information about previous employment.
>
> Fund of Information:
>
> He is able to relate current events as "the election."  He knows the names of the
> President, Governor, and Mayor.  He knows there are 52 weeks in a year.

(Tr. 464).  Dr. Davis also found that Lott was capable of abstract thinking (Tr. 465).  Dr. Davis diagnosed Lott with Personality Disorder NOS[11] and Polysubstance Abuse (Tr. 466).  His prognosis for Lott was "guarded" because he opined that it was "reasonable to expect a favorable response to treatment within the next six to twelve months *with a clean and sober patient*" (Tr. 466, emphasis added).  Dr. Davis further opined that Lott "cannot manage any benefits that may be forthcoming *due to polysubstance abuse*" (Tr. 466, emphasis added).  However, Dr. Davis found that Lott nonetheless "has the ability to do simple, routine, repetitive type tasks [and] can get along with others" (Tr. 466).

Between March 10, 2009 and May 6, 2009, Lott received treatment at the Biloxi VA Medical Center (Tr. 488-512).  Lott tested positive for cocaine use when he first presented on March 10, 2009 (Tr. 510).  On March 31, 2009, Lott's Addiction Therapist, Willie King, completed an Addiction Severity Index (ASI) (Tr. 498-502).  King reported that, in the 30 days prior to the interview, Lott claimed to have experienced unspecified medical problems on 20 days, "which bothered him only slightly" and he considered treatment for medical problems to be "slightly important" (Tr. 499).  King also reported that Lott had not been employed in the last three years but he "considers treatment for employment problems to be not at all important" (Tr. 499).  With respect to Lott's alcohol and drug use, it was reported as follows:

> Mr. Lott says he has been treated 2 times for alcohol abuse and has been treated 3 times for drug abuse.  He reports that he spent $50 on alcohol and $20 on drugs during the past month.  Further, he denies being treated in an outpatient setting for alcohol or drugs in the past 30 days.  During the month prior to this interview,[Lott] reports he – He says he was bothered slightly by alcohol problems and was slightly bothered by drug problems during the time period.  He

---

[11] "Personality Disorder" refers to a general category of mental health disorder, while "NOS" means "Not otherwise specified".  http://askthepsych.com/atp/2008/03/10/personality-disorder-diagnosis/.  "Using NOS is the clinician's way of saying there is a diagnosis in this general category but I don't have enough information to make a specific diagnosis yet."  *Id*., by Joseph M Carver, PhD.

considers treatment for alcohol problems to be slightly important and treatment for drug problems to be considerably important.

(Tr. 500). Lott also reported that, in the last 30 days and during his lifetime, he had experienced serious depression, anxiety or tension; trouble understanding, concentrating or remembering; and trouble controlling his violent behavior. He reported that he was bothered slightly by these psychological or emotional problems in the month prior to the interview and considered treatment for these problems to be slightly important (Tr. 501). A Master Treatment Plan was developed with Lott's participation, which was expected to last a year (Tr. 493-498).

Lott presented on May 21, 2009, for an individual counseling session with King, his Addiction Therapist, who reported that Lott's mood was upbeat and he demonstrated "a fair insight into the present situation," including his "sentencing for possession of paraphernalia and cocaine" (Tr. 565). Lott reported to King that "the Federal charge of possession of cocaine was dropped and reduced to a misdemeanor [for which he] was sentenced to 1 year in jail, however, suspended and given 2 years probation" (Tr. 565). King reported that, "[s]ince [Lott] is fearfully [sic] of losing his freedom, we hope he attends the sessions for support of his addictions" (Tr. 566).

On June 24, 2009, Lott presented for his scheduled appointment with Nathanial Abston, Jr., Ph.D., a Clinical Psychologist, and reported that his current medication regime was helpful in controlling his symptoms. He also reported that he had slipped the day before and "smoked a little cocaine after being clean for several month" (Tr. 563). He described his mood as "worried" (Tr. 563). He was then escorted to his Addiction Therapist for an unscheduled appointment (Tr. 561). He told King that, when he called in to his parole officer, he was advised that his "number" came up for a drug screen (Tr. 561). He was very concerned because he was on probation and faced incarceration if he tested positive for cocaine (Tr. 561-62). King advised

him to be honest and tell his parole officer the truth about his "slip" (Tr. 562). Lott telephoned King on July 8, 2009, to tell him that his court appearance went well and that the court was lenient and "chose to send him to Narcotics Anonymous x3 a week" (Tr. 560).

On July 28, 2009, Loot presented to Magdy Ragheb, M.D. for an Initial Psychiatric Evaluation (Tr. 555-560). Dr. Ragheb reported that Lott "has found himself being tired more often but denies having trouble with attention, concentration or any changes with sleep and appetite pattern" (Tr. 556).

On July 28, 2009, Lott also presented to Geoffrey W. Daugherty, M.D., his primary care physician, with "[n]o complaints except some mild nocturia" (Tr. 549).[12] Lott's physical examination revealed that he was "[a]lert, oriented, conversant, and no problems with speech, word finding, etc. [and] [m]emory seems essentially normal" (Tr. 550). Dr. Daugherty reported that Lott's "[c]urrent problems seem to be more related to substance abuse" (Tr. 550).

On August 5, 2009, Lott underwent an Addiction Psychiatry Risk Assessment Screening by King, his Addiction Therapist (Tr. 545-549). It was noted in this assessment that Lott's memory "appeared intact" and his computation skills were good (Tr. 548). His perception was also reported to be in the normal range (Tr. 548). Lott expressed a desire to enter a special treatment program in Biloxi[13] and was counseled on the criteria for entry into that program (Tr. 548). He agreed to participate in "the MOPC Relapse Prevention program" until he was accepted into the special Biloxi program.

---

[12] Nocturia is a condition in which you wake up during the night because you have to urinate. www.my.clevelandclinic.org/disorders/nocturia/hic_nocturia.aspx

[13] This program is the Substance Abuse Psychosocial Residential Rehab Treatment Program ("SA-PRRRTP Program") and is located in the Biloxi VA Medical Center (Tr. 542). There are only 20 beds in this program (Tr. 543). Admission criteria include, in addition to an available bed, a Medical Clearance Exam and a drug screen report indicating that he is drug and alcohol abstinent" (Tr. 542).

On August 14, 2009, Lott presented to King for an individual counseling session (Tr. 544-545). He had tested positive for cocaine and his parole officer instructed him that he had 24 hours to get into a program or go to jail (Tr. 544).

On August 18, 2009, Lott presented to another Addiction Therapist, Scott Statham,[14] to obtain information concerning the Biloxi SA-PRRTP Program (542-543) and documentation that he was being referred to that program, which he could present to his parole officer on August 19, 2009 (Tr. 541). Statham reported that he thought Lott might obtain admission by "about October 1, 2009" (Tr. 543). Stratham also reported that Lott's mood was "up, happy and looking forward to success in the treatment he is getting here in the VA" (Tr. 541).

On September 1, 2009, Dr. Daugherty examined Lott (Tr. 535-538). Lott reported that he could not run his own business anymore because he "can't make good decisions" (Tr. 537). Dr. Daugherty noted that Lott "might be able to do manual labor under direct supervision" (Tr. 537). Lott's blood pressure was borderline elevated, which he attributed to "drinking a beer last night" and failing to take his "antihypertension" medicine that day (Tr. 535-36). Dr. Daugherty noted that drinking beer was "not a good thing" (Tr. 536). He also questioned Lott's contention that he "still had some [blood pressure medicine] at home," when he "should have run out two months ago" (Tr.536).

On September 4, 2009, Lott and his Addiction Therapist, King, devised a new Master Treatment Plan (Tr. 527-532). On September 29, 2009, Lott appeared without an appointment to see King, who was out of the office that week, but was seen by Stratham and advised of the status of his referral to the Biloxi SA-PRRTP Program (Tr. 526). On October 6, 2009, Lott was

---

[14] Lott's regular therapist was out sick on August 18, 2009 (Tr. 540).

accepted by the Biloxi SA-PRRTP Program for admission on November 16, 2009 (Tr. 522), a date subsequently changed to December 7, 2009 (Tr. 524).

On October 26, 2009, Lott presented to King for an individual counseling session (Tr. 521-22). Lott discussed his pending Social Security Disability claim, the times he had previously attended residential treatment programs for his drug and alcohol abuse, and the two times he had tested positive for drugs during the present treatment program (Tr. 521). King reported that Lott's mood was upbeat and he demonstrated a fair insight into his present situation (Tr. 521).

On December 4, 2009, King completed a Mental Residual Functional Capacity Questionnaire for Lott (Tr. 567-68). King opined that Lott was mildly limited in his ability to understand, carry out and remember instructions, and to respond appropriately to supervision and customary work pressures (Tr. 567-68). He further opined that Lott had only mild limitations in his ability perform repetitive tasks and complete work related activities in a normal workday or workweek (Tr. 568). King indicated that Lott was moderately limited[15] in his ability to maintain social functioning, respond appropriately to co-workers, and perform simple tasks" (Tr. 568). King estimated frequent deficiencies in Lott's concentration, persistence or pace (Tr. 567), but also noted that Lott's alcohol/substance abuse was ***"material"*** to the functional restrictions listed on that form (Tr. 568, emphasis added). Lott indicated his agreement with the limitations set forth on this form and the materiality of his drug and alcohol abuse to those limitations by signing the document along with King (Tr. 568).

Lott was admitted to the Biloxi SA-PRRTP Program on December 7, 2009, and was first assessed by a Staff Nurse, James W. Chandler, Jr., R.N. (Tr. 689-696). Nurse Chandler noted

---

[15] The form used by King to evaluate Lott's Mental Residual Functional Capacity defines "moderate" as "[a]n impairment which affects but does not preclude ability to function independently, appropriately, effectively and on a sustained basis" (Tr. 567).

that Lott was able to perform his activities of daily living without assistance and was capable of planning for his own care (Tr. 695). He also reported that Lott knew when to take each of his seven medications and knew the reasons each medication is prescribed (Tr. 696).

The Staff Psychologist, Stephen M. McNally, evaluated Lott on December 8, 2009 (Tr. 685-688). Lott reported to McNally that he was "last employed one and a half years ago attempting to restart his nursery" (Tr. 685). Dr. McNally reported that Lott's "[r]ecent memory was severely impaired in that he was only able to remember one word after five minutes" but that his "remote memory was mildly impaired" and he was "able to think in abstract terms and judgment was good on two hypothetical questions" (Tr. 686). Dr. McNally also reported:

> General fund of knowledge was consistent with his high school degree/BS degree in Agriculture and Business Economics and it is believed that he is currently functioning in the average to low average range of intelligence. He was in a coma for two months after a closed head injury in 2003 with residual memory deficit and his last drink was on 12/1/09.

(Tr. 686). Dr. McNally recommended, *inter alia*, that:

> Mr. Lott needs to: refresh his memory related to the recovery progress, learn new coping skills, use cognitive behavioral techniques to decrease his current level of depression, take notes in lectures to help him remember the material that was presented, ask questions when he does not understand what to do, increase his current level of self esteem, attend AA/NA meetings and obtain a sponsor and develop a viable after core plan.

(Tr. 687).

On December 9, 2009, Ralph M. Bridges, a Recreational Therapist, assessed Lott and developed a Recreational Therapy Master Treatment Plan (Tr. 669-672). In conjunction with this assessment, Lott reported that, in the past twelve months, he used his free time "walking, using drugs, drinking, socializing with associates, tv, movies, and sitting outside" (Tr. 670). Lott informed Mr. Bridges that, upon discharge, his plans for his free time included "fishing, pool, bowling, going to Snyder's gym, walking, engaging in cards, community reintegration program, .

. .tv, movies, putt golf, socializing with peers, maintaining a positive attitude toward structuring his leisure time to remain drug free, and attending NA/AA meetings" (Tr. 670).

During an assessment (Tr. 662-668) on December 10, 2009, by Kimila R. Deflanders, a Social Worker, Lott reported that his longest period of sobriety was four to five years as a result of an ultimatum given when he got married (Tr. 664). He stated that during this time he "stayed busy" but he resumed drinking when his 19-year-old son died (Tr. 664). Lott also told Deflanders that his admission was ordered by the court and, if he did not complete treatment, he would go to jail (Tr. 664). He also reported that he had not earned money in two years but had been working on his farm and his leisure activities included the computer, maintenance around the farm and drug use (tr. 667). Lott told Deflanders that, four years ago, he was admitted to a psychiatric hospital after his mother reported that he put a gun to his head but that he "does not feel he was suicidal but feels he was trying to get whatever he needed at that time from his mother" (Tr. 666). In a subsequent progress note, Deflanders reported that Lott listed his goals as "want mind to believe in self again" and identified his strengths as "accomplish things that I set my mind to do and good businessman" (Tr. 659). Lott also identified his obstacles as "his son's death and drug abuse" (Tr. 659).

Lott's Recreational Therapist, Ralph Bridges, reported that he participated in a group therapy session on December 10, 2009, at which he was taught, "developed a working knowledge" and participated in a board game known as Rummikub[16] (Tr. 658). Bridges also noted that Lott was "interactive with peers and staff" and dis[played a positive attitude (Tr. 658).

On December 14, 2009, Dennis K. Halsey, Addiction Therapist, developed a Master Treatment Plan with Lott to govern his care (Tr. 641-648). One problem identified in this report

---

[16] "Rummikub is "[a] fast-moving rummy tile game." http://www.amazon.com : Rummikub: Board Games: Toys & Games.

was that Lott was unemployed "due primarily to his addiction" (Tr.645).  One of the short term

goals identified to combat this problem was that Lott "[v]erbalize how volunteerism in

community, church or veterans organizations can have an impact on self-esteem, how it can fill

the day now that drinking and druging [sic] is arrested" (Tr. 645).  In a Small Group Counseling

Note entered on December 15, 2009, Therapist Halsey noted that Lott disclosed some lies he told

others to obtain money to drink, or drugs to use" and admitted that "he would tell most anything

to get what he wanted" (Tr. 637).

On December 16, 2009, Jane Elizabeth Varner, Ph.D., a Staff Psychologist, reported that,

during an individual Therapy session, Lott's "[a]ttention and concentration were fair" and that,

although he had a tendency to get off topic, "he was easily redirected" and his "[j]udgment and

insight seemed fair" (Tr. 632).  The records of Lott's treatment contain numerous references to

his active participation in each treatment session, both individual and group (Tr. 605, 608, 610,

617, 619, 625, 627, 628, and 630).

On December 30, 2009, reported to the Staff Psychologist, McNally, during their

individual session, that he was "thinking about restarting his old nursery on a small scale and

selling plants to help him generate some cash flow and keep him busy during the day" and that

he planned to "salvage a number of plants from the land that his parents bought back after his

business failed due mainly to his cocaine dependence" (Tr. 603-04).   Subsequently that day, Lott

participated in an individual therapy session with Dr. Varner, who reported:

> [Lott] arrived to the scheduled session on time.  He was alert and oriented to
> person, place, time, and situation.  His mood appeared euthymic,[17] and he
> reported that he was doing well.  However, when he spoke of his son's death, he
> became tearful.  Affect was full range and congruent with mood.  Eye contact was
> good.  Speech was within normal rate, rhythm, tone, and volume.  Thought
> process seemed linear and goal-directed.  No hallucinations were reported or

---

[17] Euthymic is a term "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated."  http://medical-dictionary.thefreedictionary.com/euthymic.

delusional content evident. Attention and concentration were fair. His memory seemed impaired, as evidence [sic] by his repeating several of the things he shared in the previous session [on December 16, 2009]. He also spoke of a handout and thought this provider had given it to him. However, he must have received the handout from the chaplain. Judgment and insight seem fair.

(Tr. 601).

On January 2, 2010, Lott participated in Bingo on the ward (Tr. 598). Lott had his last individual session with the Staff Psychologist, McNally, on January 6, 2010, at which time it was reported that:

> [Lott] accomplished his main goals of becoming more aware of his feelings, he learned to recognize safe coping that he engaged in on a regular basis and he learned new safe coping skills. He plans to open his plant nursery on a small scale in the near future, he was recently granted a NSC pension [and "received $5K back pay" (Tr. 588)], and he plans to move next door to his parents home after he fixes up a home some of his former employees used to live in when the nursery brought in one million dollars a year in net income.

(Tr. 587). On January 7, 2010, Lott had his last individual session with Dr. Varner, who again reported that his "memory seemed impaired, as evidenced by continuing to repeat several of the things he shared in the previous sessions" (Tr. 584). Later that same day, Lott joined "a structured therapeutic recreation therapy group" and "developed working knowledge of the rules [of "Rummy"]" (Tr. 581-82).

Lott was discharged from the Biloxi SA-PRRTP Program on January 8, 2010 (Tr. 576). Although Lott's motivation was questioned,[18] the records state that he "completed the SARRTP program; all required out-processing has been done and [Lott] has received a regular discharge" (Tr. 576).

---

[18] Lott's Addiction Therapist, Dennis Halsey, reported the following:

> Veteran fails to internalize the severity of his addiction and is getting clean and sober for the courts, family members and children. Not himself.

(Tr. 575).

On February 16, 2010, Lott reported to his primary care physician, Dr. Daugherty, that he tested positive for cocaine during a random urine test for his parole officer and that he either has to return to a rehab program or go to jail (Tr. 790). Lott attended a Relapse Prevention Group Session on February 18, 2010 (Tr. 787-88). On February 26, 2010, Lott reported to his Addiction Therapist, King, that he was arranging his admission to a 90 day program in Tuscaloosa, Alabama, but would continue to participate in the Relapse Prevention Group and individual therapy sessions until such admission (Tr. 786).

Lott attended a Relapse Prevention Group on March 1, 2010, and "became the focus of the meeting" because he was identified as the "Suffering Addict" (Tr. 784-85). Lott presented to King for a scheduled individual session on March 2, 2010, and he reported that Lott was candid about testing positive for cocaine on March 1, 2010, and again being required to enroll in a 90 day program or face incarceration (Tr. 783). Lott attended another Relapse Prevention Group on March 3, 2010 (Tr. 782) and on March 4, 2010 (Tr. 780-81). Lott presented to King for a scheduled individual session on March 5, 2010, and he reported that Lott was "not accepted into the 90 day program in Tuscaloosa, AL" (Tr. 779). King also opined that Lott "is a little naive in making contact with others who are using" (Tr. 779). King also reported that Lott would be processed to attend the Biloxi SA-PRRTP Program but that it would be "Biloxi's decision whether are [sic] not to accept [Lott] once again for alcohol and drug treatment" (Tr. 779).

On March 22, 2010, Lott presented to Dr. Ragheb for a scheduled appointment (Tr. 769-770). Lott denied any current alcohol or substance abuse but admitted that he had tested positive for cocaine three weeks ago and, since he was still on Probation, he was "considering Tuscaloosa Program" (Tr. 769). Dr. Ragheb reported that Lott was "agreeable, discussed therapy and medicine, patient educated and motivated to follow up with same meds and with therapy . . . and

knows what to do if need [sic] any help with that" (Tr. 770). Lott presented to Dr. Ragheb on April 13, 2010, for another scheduled visit and she reported that he was "well informed about meds, therapy, PRRTP Biloxi [sic] program" (Tr. 757).

On April 14, 2010, Theresa A. Rozum, a Social Worker, reported that Lott was alert, oriented, communicative, maintained good eye contact, had an animated, pleasant mood, and demonstrated logical and goal directed thought processes (Tr. 753). On May 13, 2010, Lott presented to King for an "unscheduled appointment" related to his need to enter a residential treatment program "within 7 days" by orders of his Probation Officer because of his recent use of cocaine (Tr. 739). King reported that Lott had been attending the Relapse Prevention Group sessions 3-4 times a week at the Mental Health Center[19] but did not have a sponsor and did not attend group sessions in his local community where he might acquire a sponsor, which he was encouraged to do (Tr. 739). King also opined that Lott was "very manipulative in his actions to avoid incarceration" (Tr. 740).

Lott presented to Dr. Daugherty on April 14, 2010 (Tr. 748-51) and June 8, 2010 (Tr. 729-33). On both occasions, Dr. Daugherty reported that, with respect to Lott's history of closed head trauma with cognitive deficits, there were "no changes – rambling, impulsive, asks repetitive questions but pleasant (Tr. 749, 731). Dr. Daugherty also reported that Lott's understanding of his instructions concerning blood pressure monitoring, diet and exercise was "good" (Tr. 732).

---

[19] Lott attended the following Relapse Prevention Groups: March 8, 2010 (Tr. 778-79), March 9, 2010 (Tr. 776-77), March 11, 2010 (Tr. 774-76), March 15, 2010 (Tr. 773-74), March 18, 2010 (Tr. 772-73), March 22, 2010 (Tr. 771), March 23, 2010 (Tr. 768), March 25, 2010 (Tr. 766-67), March 29, 2010 (Tr. 765-66), March 30, 2010 (Tr. 764-65), April 1, 2010 (Tr. 763-64), April 5, 2010 (Tr. 762-63), April 7, 2010 (Tr. 761), April 8, 2010 (Tr. 759-60), April 12, 2010 (Tr. 757-58), April 13, 2010 (Tr. 754-56), April 15, 2010 (Tr. 747-48), April 21, 2010 (Tr. 746-47), April 22, 2010 (Tr. 745), April 26, 2010 (Tr. 744), April 29, 2010 (Tr. 743), May 4, 2010 (Tr. 742), May 10, 2010 (Tr. 740-41), May 17, 2010 (Tr. 737-38), May 20, 2010 (Tr. 736-37), and May 27, 2010 (Tr. 734-35).

On September 17, 2010, Lott presented again to Dr. Daugherty, who noted that he was now a resident of the Salvation Army Rehab Center (Tr. 722). On this occasion, Dr. Daugherty reported that, with respect to Lott's history of closed head trauma with cognitive deficits, there were "no changes – seems somewhat better now" (Tr. 723).

Lott also presented to King on September 17, 2010, and participated in the formation of a new Substance Use Disorder Program (SUDP) Master Treatment Plan (Tr. 716-721). King reported that Lott was "being prepped for [a return to] the SA-PRRTP Program in Biloxi" (Tr. 721).

On November 5, 2010, Dr. Ragheb and Severin W. Grenoble, a Psychiatric Resident, examined Lott (Tr. 711-715). They reported that Lott was alert, oriented, calm, cooperative, maintained good eye contact, exhibited coherent, logical and linear thought processes, average intelligence, and fair insight (Tr. 712). They also reported that his cognitive abilities were grossly within normal limits (Tr. 712). Lott advised these doctors that he was "doing well and fairly stable with [his] current meds and does not want any dose changes or additions" (Tr. 715).

On December 14, 2010, during a scheduled individual session with King, Lott reported that he was "concerned about his 6-months at the Salvation Army" [which] he feels . . . is all centered around a misunderstanding between the Salvation Army (SA) and the Parole Officer" (Tr. 709-10). Lott "stated that he informed his Parole Office[r] he had completed the program, and SA called his Parole Officer, and his pass was cancelled because of this misunderstanding" (Tr. 710). King reported that Lott "is a very manipulative individual, so its [sic] hard to say how he expressed his desires to leave the SA [to go home for Christmas], however he is assigned to the kitchen duties . . . [and] not allowed to leave the property" (Tr. 710).

On January 18, 2011, Dr. Ragheb and Harshadkumar G. Patel, a Psychiatric Resident, examined Lott (Tr. 703-706). They reported that Lott was alert, oriented, calm, cooperative but guarded, exhibited logical and goal directed thought processes, detected no abnormalities in intelligence, and fair insight (Tr. 704-05). They also reported that his cognitive abilities were normal (Tr. 705). Lott advised these doctors that he was "doing well with his current meds and does not want any changes" (Tr. 706).

C.    Lott's Testimony.

At an administrative hearing held on October 3, 2011, Lott testified he lives in a one-story home with his mother and father (Tr. 62).[20]  He was in the military from 1972 until he got out on August 20, 1974, with the rank of Specialist Fourth Class (Tr. 63). Lott confirmed that from "about 1997 to about 2003" he was in the nursery business; he grew azaleas, which he sold to Walmart and Home Depot (Tr. 64, 65).[21]  He ultimately went bankrupt and is now out of business (Tr. 64).[22]  He has not looked for any work since he last worked (Tr. 65).[23]  Lott testified that he no longer drinks "a whole lot anymore," meaning "less than a six-pack a week" (Tr. 66). He reported that it had been over a year since the time when he "drank too much" (Tr. 66). He then retracted that contention and testified that it was only since "Mardi Gras" that he

---

[20] At the administrative hearing on February 24, 2010, Lott testified that this home belongs to his parents (Tr. 89). Prior to moving in with his parents, he lived next door on their property (Tr. 89).

[21] At the administrative hearing on February 24, 2010, Lott testified that he "ran a wholesale nursery for 29 years" (Tr. 90).

[22] Lott previously testified that, before his injury in the ATV accident on June 13, 2003, "I had 500 Walmarts and 300 Home Depot stores that I put flowers in [but] after that, I made wrong decisions on when to fertilize and when to cut back and what to do when it got cold" (Tr. 104). Lott further testified that "Hurricane Katrina kind of put an end on that, and I didn't make all my bank notes that year [and] [g]ot foreclosed on" (Tr. 104)

[23] Lott previously testified that he last worked in December 2007 (Tr. 91).

stopped drinking "too much" (Tr. 66).[24] He further testified that it had been "around a year ago" that he last used illegal drugs (Tr. 66).

Lott testified that he could not work because "it's my memory that's just not there" (Tr. 66-67).[25] He confirmed that he could read and write, add and subtract, multiply and divide, make change for a $20.00 bill (Tr. 63-64). As to his ability to handle financial matters such as paying bills, Lott testified that he "just sometimes spend[s] more time than [he] thinks [he has]" (Tr. 64). He testified that he takes four or five medicines he gets through the VA, including medicine for depression, blood pressure, acid reflux, and allergies, (Tr. 67-68). Lott stated that he was "totally blind in[his] left eye" but his vision in his right eye is okay as long as he has his glasses (Tr. 70). Lott testified that his ability to walk is only affected by how hot it is, he can stand up all the time and he has no problems sitting (Tr. 71). His ability to lift and carry is only limited by his blindness in the left eye because he "can't judge distance with just one eye," which causes him to bump into things (Tr. 72). He has a driver's license and is able to drive (Tr. 72). He can climb stairs, bend over to pick something up he dropped, stoop or squat using his knees, and grip and use his hands (Tr. 72-73). He can also make himself simple meals, bathe and dress himself, help his mother do the laundry and other housework (Tr. 73-74). His activities during the day include playing on the computer, reading, watching TV and getting out of the house every day (Tr. 75).[26]

     D.    Vocational Expert's Testimony.

---

[24] Mardi Gras Day fell on Tuesday, March 8, 2011, seven months prior to the October 3, 2011 administrative hearing (Tr. 58-84) and over one year following the February 24, 2010 administrative hearing 9Tr. 85-109) on Lott's application for DIB and SSI benefits.

[25] At the administrative hearing on February 24, 2010, Lott testified that "when I'm not under pressure, I can think; but when I'm under pressure, I make wrong decisions" (Tr. 99).

[26] Lott previously testified that "I don't like being in crowds, but I don't have any problems when I'm in them. I just don't like to be in a crowd" (Tr. 103).

Eric Anderson, the Vocational Expert (VE), was called to testify by the ALJ regarding Lott's past relevant work. (Tr. 77). He concluded that Lott was a "nursery manager" (DOT code number 180.167-042), which would be classified as light and skilled (SVP level of 8). Mr. Anderson was then presented with a hypothetical of a man Lott's age, education and prior work background who was not limited in the ability to sit, stand, walk, or the ability to lift and carry, but was limited to work requiring no more than simple, routine, repetitive type tasks, occasional contact with the general public, casual contact with coworkers and supervisors and who must avoid work requiring fine visual acuity (Tr.77-78).

Mr. Anderson testified that such an individual could perform the following unskilled jobs: janitor (DOT 381.687-018) which is medium, unskilled (SVP level of 2) with 2,090,000 jobs available nationally and 26,700 available in Alabama; hand packer (DOT 920.587-018) which is medium, unskilled (SVP level of 2) with 7,600 jobs available nationally and 8,200 available in Alabama; kitchen helper (DOT 318.687-010) which is medium, unskilled (SVP level of 2) with 550,000 jobs available nationally and 11,000 available in Alabama (Tr. 78).

A second hypothetical was presented in which "the individual would be unable to sustain concentration, remain on target or remain on task for two hours at a time due to memory deficits" (Tr. 78). Mr. Anderson testified that there would exist no jobs for such an individual (Tr. 78).

E.    ALJ's Decision.

The ALJ followed the Commissioner's five-step sequential evaluation process in reaching her decision on November 14, 2011. *See* 20 C.F.R. § 404.1520(a)(4).[27] The ALJ found that Lott's cocaine dependence, alcohol dependence, adjustment disorder with depression and

---

[27] The Commissioner's regulations governing evaluation of DIB claims are found at 20 C.F.R § 404.1501 et seq. Largely identical regulations governing SSI claims can be found at 20 C.F.R. § 416.901 et seq. The undersigned will cite only to the DIB regulations.

anxiety, depressive disorder, personality disorder, left eye blindness, and a cognitive disorder secondary to a closed head injury were severe impairments (Tr. 20, Finding 3), and that these impairments, including the substance abuse disorders, meet listings 12.04, 12.06 and 12.09 at 20 C.F.R. Part 404, Subpt. P, Appx, 1 (20 C.F.R. 404-1520(d) and 416.920(d)) (Tr. 21, Finding 4). The ALJ also found that, even if Lott ceased all substance abuse, his underlying psychological problems, cognitive disorder secondary to his closed head injury and his left eye blindness would continue to be severe impairments (Tr. 22, Finding 5).

Lott cannot, however, under the Social Security Act, as amended, be considered disabled if alcoholism or drug addiction is a contributing factor material to the determination of disability. *See* 42 U.S.C.§§ 423(d)(2)(C).  In other words, even if the five-step sequential evaluation process leads to the conclusion that a claimant is disabled, where there is medical evidence of the claimant's drug addiction or alcoholism (DAA), the ALJ must additionally determine whether the DAA is a contributing factor material to the determination of disability. *See* 20 C.F.R. § 404.1535. Here, the ALJ found that, if Lott stopped using drugs and alcohol, he would retain the residual functional capacity (RFC) to perform medium work (as that term is defined in 20 C.F.R.§ 404.1567(c)) provided it was limited to simple, routine, repetitive type tasks, occasional contact with the general public, and casual contact with co-workers and supervisors and did not require visual acuity (Tr. 25). While Lott could not perform his past work with that RFC, the Vocational Expert testified that he could perform other work, which exists in significant numbers in the national economy (Tr. 28-29). Thus, the ALJ concluded that Lott's DAA was a contributing factor material to the determination of disability, and that he was not, therefore, disabled under the Act (Tr. 29-30).

V.      Analysis.

A.      **The ALJ properly assigned little weight to the VA's Rating Decision and adequately explained her position.**

Lott argues that the ALJ "committed reversible error in not assigning any weight, pursuant to Social Security Regulation 20 C.F.R. 4041512(a)(6) [sic] and Social Security Ruling 06-03p, to a VA decision issued on December 28, 2009, finding the Plaintiff unemployable and eligible for a VA pension effective May 26, 2009, while failing to explain the reasons for doing so in a manner that would allow a reasoned review." (Doc. 11 at 2).[28]  The Commissioner argues, in sum, that the ALJ was not bound by the VA's findings and cited good reasons for disregarding the subject Rating Decision, including the fact that it was "inconsistent with the longitudinal record," that the "VA disability standards differ from SSA's," and because the VA disability determination did not mention Lott's substance abuse problems, which the ALJ was required by law to consider.  (Doc. 12 at 6).

The applicable Social Security Regulations in this case are 20 C.F.R. §§ 404.1504 and 416.904, which provide, in pertinent part:

> [a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and *is not our decision* about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind *is not binding on us*.

20 C.F.R. §§ 404.1504(a) and 416.904(a) (emphasis added).   Social Security Ruling 06-03p indeed states, as Lott contends, that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."  (Doc. 11 at 3, *citing*

---

[28] *See*, n. 6, *supra*.  In addition, the undersigned notes that the citation "20 C.F.R. 4041512(a)(6)" does not exist in the Social Security Regulations.

SSR 06-03p, 2006 WL 2329939, *6 (August 9, 2006). This Social Security Ruling, however, also makes it abundantly clear that:

> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are ***not bound*** by disability decisions by other governmental and nongovernmental agencies. In addition, because ***other agencies may apply different rules and standards*** than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

*Id.* at *7 (emphasis added). *See also*, Pearson v. Astrue, 271 Fed. App'x 979, 981 (11th Cir. 2008)("The record supports the conclusion by the administrative law judge that, although Pearson received a total disability rating by the Veterans Administration, he did not qualify for Social Security benefits [because] [t]he record establishes that the administrative law judge considered the rating in his decision and correctly explained that a claimant had to satisfy a more stringent standard to be found disabled under the Social Security Act."). Although Lott appears to challenge the ALJ's statement that "the VA disability standards differ from SSA's," he argues only that the ALJ "did not cite to any specific records or instances where they differ." (Doc. 11 at 3). Lott's challenge on this point is contrary to SSR 06-03p, on which he himself relies, as well as the Eleventh Circuit's opinion in Pearson, as both are quoted above.[29]

Lott's contention that the ALJ "did not adequately explain her decision to reject the VA rating" (doc. 11 at 4) is without merit. The ALJ specifically stated that she "considered the Veterans Administration determination" but gave it little weight because "it is inconsistent with the longitudinal record including the claimant's admitted capabilities, the consultative examination results, the treatment records from the VA substance abuse treatment center, the

---

[29] The fact that the VA rating decision in this case does not mention Lott's alcohol and drug abuse problems, while the ALJ was required under 42 U.S.C. § 423(d)(2)(C) to consider it, demonstrated the unavoidable difference between the disability standards employed by the VA and the SSA.

substantial evidence of substance abuse materiality, and other evidence discussed herein" (Tr. 28). One inconsistency directly referred to by the ALJ was the conclusion of Lott's long time treating physician, Dr. Daugherty, on July 28, 2009, that his "current problems seem to be more related to substance abuse" (Tr. 26, *citing* Tr. 550).[30]

Another inconsistency referred to by the ALJ involves Lott's own admission that, even when abusing substances, "he is able to take care of his own personal needs such as bathing and grooming without significant difficulty and that he drives, goes to the grocery store, prepares simple meals for himself, completes most chores inside and outside his home, and watches television on a daily basis for leisure" (Tr. 23, *citing* Tr. 284-288). Yet another inconsistency addressed by the ALJ relates to the inpatient substance abuse treatment records at the VA that reflect Lott's plans upon discharge, which "included fishing, pool, bowling, going to the gym, walking, playing cards, watching television and movies, and attending support group meetings" (Tr. 23, *citing* Tr. 670). The ALJ also referred to the opinion of the State agency psychiatric consultant, Donald E. Hinton, Ph.D., that Lott, even when abusing drugs and alcohol, has only "mild limitation" in the area of Activities of Daily Living and only "moderate limitation" in social functioning and with regard to concentration, persistence and pace (Tr. 23, *citing* Tr. 479).[31]

---

[30] The ALJ also addressed a statement issued by Dr. Daugherty on November 21, 2009, to the Alabama Department of Human Resources "suggesting that [Lott] is disabled"(Tr. 27, citing 487). The ALJ assigned little weight to this statement because it was "submitted so that [Lott] could obtain food stamps," and "it contain[ed] no specific functional limitations," invaded the province of the ALJ to determine the ultimate issue of disability, and was "inconsistent with Dr. Daugherty's own treatment notes" (Tr. 27, *citing* Tr. 549-551).

[31] The ALJ referred to Lott's plans to socialize with his peers and spend more time with his family (Tr. 23, *citing* Tr. 604) as well as the observation of Jane Elizabeth Varner, Ph.D. a few days before Lott's discharge from the VA inpatient substance abuse treatment center that Lott "was fully oriented, that his eye contact was good, that his thought process was linear and goal-directed, that his speech was normal, and that he was free of delusions and suicidal ideations" (Tr. 23, *citing* Tr. 584). The ALJ also referred to

Another inconsistency directly addressed by the ALJ relates to the psychological examination and testing of Lott conducted by Daniel Koch, Ph.D. on August 29, 2008, which revealed an average IQ, high school level reading and math skills, and sixth grade spelling skills, even though he had some deficits in attention. (Tr. 23-24, *citing* Tr. 449-452). Similarly, the ALJ referred to the examination conducted of Lott by John Davis, Ph.D. on November 3, 2008, resulting in an opinion that Lott could do simple, routine, repetitive type tasks (Tr. 24, *citing* Tr. 462-66). Neither of these reports is consistent with disabling mental limitations and, as noted by the ALJ, both of examinations addressed Lott's functioning during a time when he was still abusing drugs and alcohol (Tr. 46). In addition, Lott's substance abuse counselor, Mr. King, submitted a RFC questionnaire in December 2009, which indicated that Plaintiff had mild to moderate limitations in a number of functional areas and would have frequent difficulties maintaining concentration, persistence, and pace, but stated that Lott's DAA was material to his opinion (Tr. 27, *citing* Tr. 567-68).[32]

For the reasons stated above, the ALJ applied the proper legal standard with respect to the weight she attributed to the VA Rating Decision in this case and adequately explained her decision so as to provide for a reasoned review by this Court. The ALJ's did not, therefore, commit any reversible error on this point.

---

Lott's admission that, even when abusing drugs and alcohol, "he is able to do concentration and memory intensive tasks such as driving, paying bills, counting change, managing a savings account, and watching television . . . [and] to pay attention for 'as long as I am interested' and is good at following oral and written instructions" (Tr. 23, *citing* Tr. 286-288).

[32] The ALJ gave "some weight" to Mr. King's opinion, even though he is not deemed "an acceptable medical source," because she found it to be "consistent with the longitudinal record including the treatment records reflecting significant improvement during periods of sobriety" (Tr. 27). The ALJ also noted that Lott signed off on this assessment, "thereby agreeing with the limitations set forth therein and with the fact that substance abuse is material to his limitations" (Tr. 27, citing Tr. 568).

B.   **The ALJ's residual functional capacity ("RFC") determination was supported by substantial evidence.**

Lott also argues that the ALJ's assessment of his RFC was not supported by substantial evidence. (Doc. 11 at 5). There are two elements to Lott's argument:

- The ALJ "failed to reference any physical impairments or limitations that would lead to a physical residual functional capacity of medium work." (*Id.*)

- The ALJ "recognized [Lott's] cognitive disorder secondary to closed head injury as a severe impairment but then rejected the existence of that condition in her discussion regarding the residual functional capacity." (*Id.* at 7).

Neither of these elements has any merit.

The undersigned finds no error with the ALJ's determination that Lott has the residual functional capacity to perform medium work and that substantial evidence in the record supports her determination. The residual functional capacity assessment is a measure of what a claimant can do despite functional limitations. 20 C.F.R. § 404.1545; 20 C.F.R. § 416.945. The administrative rulings define residual functional capacity as

> what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities.

SSR 96-8p, 1996 WL 374184, *2 (July 2, 1996). The ALJ makes an RFC finding based on all the "relevant medical and other evidence." Siverio v. Commissioner of Soc. Sec., 461 Fed. App'x 869, 871 (11th Cir. Feb. 23, 2012) (*per curiam*), *quoting* 20 C.F.R. § 404.1545(a)(3)[33].

Lott challenges the ALJ's determination that he is limited to "medium" work. The physical activities needed to carry out medium work has been described as follows:

---

[33] The regulations further provide that the claimant is, in general, "responsible for providing the evidence [the ALJ] will use to make a finding about your residual functional capacity. 20 C.F.R. § 404.1545(a)(3); see also 20 C.F.R. § 404.1512(c).

The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms. The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10, 1983 WL 31251, *5 (1983).  See also, Siverio, 461 Fed. App'x at 871 (Applying SSR 83-10 in its analysis of an RFC for sedentary work).  Lott points to no evidence in the record which establishes that he is incapable of performing these physical attributes of medium work.  He merely argues that the ALJ "failed to reference any physical impairments or limitations that would lead to a physical [RFC] of medium work."  (Doc. 11 at 5).  His position is perplexing.

If Lott is attempting to contend that he should have been assessed as capable of doing work at a higher level than "medium," his argument fails because the regulations only classify "the functional requirements of work in term of the range of the primary strength activities required" and only in terms of "[t]he primary strength activities specifically associated with sedentary, light, and medium levels of exertion [] set forth in sections 404.1567 and 416.967 of the regulations."  SSR 83-10, 1983 WL 31251 at *5.  If Lott is, instead, contending that the

evidence of record does not support the ALJ's finding that he is capable of performing the physical demands of medium work, his argument fails because he has never contended that he was physically incapable of performing medium work[34] and there is more than ample evidence in the record to support his physical abilities to perform medium work.

Lott testified at both administrative hearings that his ability to walk is only affected by how hot it is, he can stand up all the time and he has no problems sitting (Tr. 71, 99-100). His ability to lift and carry is only limited by his blindness in the left eye because he "can't judge distance with just one eye," which causes him to bump into things (Tr. 72, 96). He has a driver's license and is able to drive (Tr. 72). He can climb stairs, bend over to pick something up he dropped, stoop or squat using his knees, and grip and use his hands (Tr. 72-73, 101). He can also make himself simple meals, bathe and dress himself, help his mother do the laundry and other housework (Tr. 73-74, 101). His activities during the day include playing on the computer, reading, watching TV and getting out of the house every day (Tr. 75). He further testified that he is "totally blind in[his] left eye" but his vision in his right eye is okay as long as he has his glasses (Tr. 70, 96). The ALJ also noted that "[n]ear the end of his [inpatient] stay he expressed that he was feeling better and that his plans for when he left the hospital included fishing, pool, bowling, going to the gym, walking, playing cards, watching television and movies, attending support group meetings, community reintegration, socializing with peers, [] attending substance abuse meetings, spending time with family, and starting his business back on a small scale" (Tr. 26, citing Tr. 603-604 and 670). All these physical activities are consistent with the ALJ's conclusion that Lott is capable of performing the physical requirements of medium work. Lott's

---

[34] Lott confirmed that the impairments found to be severe by the ALJ, including "cocaine dependence, alcohol dependence, adjustment disorder with depression and anxiety, depressive disorder, personality disorder, left eye blindness, and cognitive disorder secondary to closed head injury "affected only cognition and sight." (Doc. 11 at 5).

contentions to the contrary are without merit.

In addition to finding that Lott could perform medium work, the ALJ's RFC assessment limited Lott "to simple, routine, repetitive type tasks; occasional contact with the general public; and casual contact with co-workers and supervisors" (Tr. 25, Finding 7).[35] These restrictions are consistent with the regulatory definition of "unskilled" work. Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568(a); SSR 83-10, 1983 WL 31251 at *7 ("The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding, and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending."). The regulations also make it clear that basic work activities are "the abilities and aptitudes necessary to do most jobs" and include "understanding, carrying out, and remembering simple instructions." Id. § 404.1561(b); SSR 85-15, 1985 WL 56857, at *4 (1985). These regulations, read together, establish that unskilled work requires the ability to understand, carry out, and remember simple instructions and duties—precisely the type of duties the ALJ found that Lott retained the ability to perform despite his cognitive disorder secondary to closed head injury and his other psychological impairments. (Tr. 25, Finding 7). In addition, as SSR 00-4p explains, "[u]sing the skill level definitions in 20 CFR [§] 404.1568 . . . unskilled work corresponds to an SVP of 1-2." SSR 00-4p, 2000 WL 1898704, at *3.

In relation to his cognitive problems, Lott argues, in sum, that the ALJ erred by finding that "[a]lthough the claimant alleges that he has cognitive problems related to his ATV accident,

---

[35] The ALJ also held that he "is unable to perform jobs requiring fine visual acuity" (Tr. 25, Finding 7). This portion of her finding is not challenged in this appeal.

there is no imaging or other testing to confirm the existence of permanent brain damage." (Doc.

11 at 5, quoting Tr. 25). Lott thereafter offers only a generalized statement that "[t]he

Commissioner of Social Security must develop 'a full and fair record regarding vocational

opportunities available to the claimant'." *Id., citing* Allen v. Sullivan, 880 F.2d 1200, 1201 (11th

Cir. 1989). Lott does not delineate in what manner he intimates that the ALJ failed to meet her

burden in this regard. In the case relied upon by Lott, however, the Eleventh Circuit describes

the ALJ's obligation as follows:

> The ALJ must articulate specific jobs that the claimant is able to perform, and this
> finding must be supported by substantial evidence, not mere intuition or
> conjecture. *See* Cowart v. Schweiker, 662 F.2d 731, 736 (11th Cir.1981). . . .
> Ordinarily, when non-exertional limitations are alleged, vocational testimony is
> used. *See* Cowart v. Schweiker, 662 F.2d at 736; *see also* MacGregor v. Bowen,
> 786 F.2d 1050, 1054 (11th Cir.1986) ("When there have been non-exertional
> factors (such as depression and medication side effects) alleged, the preferred
> method of demonstrating that the claimant can perform specific work is through
> the testimony of a vocational expert."). "It is only when the claimant can clearly
> do unlimited types of light work, ... that it is unnecessary to call a vocational
> expert to establish whether the claimant can perform work which exists in the
> national economy." Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. Unit A,
> March 1981) (emphasis in original).

Allen, 880 F.2d at 1201-02. In this case, unlike Allen, the ALJ did "elicit testimony from a

vocational expert to interpret and evaluate [Lott's] medically documented non-exertional

psychological and emotional limitations." (*Id.*). Here, Mr. Anderson testified that Lott could

perform the following unskilled jobs: janitor (DOT 381.687-018) which is medium, unskilled

(SVP level of 2) with 2,090,000 jobs available nationally and 26,700 available in Alabama; hand

packer (DOT 920.587-018) which is medium, unskilled (SVP level of 2) with 7,600 jobs

available nationally and 8,200 available in Alabama; kitchen helper (DOT 318.687-010) which

is medium, unskilled (SVP level of 2) with 550,000 jobs available nationally and 11,000

available in Alabama (Tr. 78).

Lott has also failed to establish that the ALJ did not properly account for his cognitive limitations. (Doc. 11 at 7). Lott's contention that the ALJ rejected his "cognitive disorder" appears to rest solely on the ALJ's reference to the lack of any imaging or testing that confirms the existence of permanent brain damage. (Doc. 11 at 5, *citing* Tr. 26). The ALJ's statement, however, does not establish a rejection by the ALJ of the evidence supporting her finding that his cognitive disorder was a severe impairment (Tr. 20). It merely establishes that the ALJ found no evidence that Lott had permanent brain damage. The ALJ's RFC assessment limited Lott to "simple, routine, and repetitive tasks" (Tr. 25). This is a limitation was recommended by Dr. Davis, who assessed Lott's cognitive functioning with a mental status examination (Tr. 462-66). It is also consistent with the opinion of state agency consultant, Dr. Hinton, who considered the medical record and indicated that Lott would be able to understand, remember, and carry out short and simple instructions without the need for special supervision or unusual breaks (Tr. 483-85). Under the substantial evidence standard, the ALJ's decision is entitled to deference when more than a mere scintilla of evidence supports it. Barnes v. Sullivan, 932 F.2d1356, 1357 (11th Cir. 1991). Because the ALJ's treatment of Lott's cognitive disorder was supported by significantly more evidence than a mere scintilla, it must be affirmed.

CONCLUSION

For the reasons stated above, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be and is hereby **AFFIRMED**.

**DONE** this  26th  day of February, 2014.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**